**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DONALD STUART,**

                              **Plaintiff,**                    **1:08-cv-1350**
                                                                **(GLS/DRH)**

              **v.**

**JAMES B. PEAKE,** Secretary of
Veterans Affairs,

                              **Defendant.**
_____

**APPEARANCES:**                              **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Sussman, Watkins Law Firm                     MICHAEL H. SUSSMAN, ESQ.
55 Main Street, Suite 6                       CHRISTOPHER D. WATKINS,
P.O. Box 1005                                 ESQ.
Goshen, NY 10924

**FOR THE DEFENDANT:**
HON. RICHARD S. HARTUNIAN                     BARBARA D. COTTRELL
United States Attorney                        Assistant U.S. Attorney
445 Broadway
James T. Foley U.S. Courthouse
Albany, NY 12207-2924

**Gary L. Sharpe**
**District Court Judge**


**MEMORANDUM-DECISION AND ORDER**

## I. <u>Introduction</u>

Plaintiff Donald Stuart commenced this action against defendant James B. Peake, Secretary of Veterans Affairs, under Title VII of the Civil Rights Act of 1964,[1] alleging employment-related race discrimination and unlawful retaliation. (*See* Compl., Dkt. No. 1.) Pending is Peake's motion for summary judgment. (Dkt. No. 11.) For the reasons that follow, the motion is denied.

## II. <u>Background</u>

Plaintiff Donald Stuart is an African-American male who has been employed by the Veterans Administration (VA) since 1985. (*See* Def. SMF ¶ 1, Dkt. No. 11:3.) Since 1991, Stuart has worked at the Stratton VA Medical Center in Albany, New York. (*See id.* at ¶ 2.) After serving as the Financial Manager from 1991 to 1992, Stuart took over as the Fiscal Officer, a position that he held until 1998. (*See* Stuart Dep. at 7-12, Def. Ex. C, Dkt. No. 11:7.) Then, in 1998, following changes made within the Stratton organizational structure, Stuart took on the new position of Business Office Manager. (*See id.* at 12-14.) As part of this new position,

---

[1]42 U.S.C. § 2000e, *et seq.*

2

Stuart assumed the duties of the Associate Director.  (*See id.* at 14-15.)

In June 2002, Mary-Ellen Piche, a Caucasian woman, became the Director of the Stratton facility.  (*See* Def. SMF ¶ 2, Dkt. No. 11:3.)  In May 2004, after the Associate Director position was filled, and as a result of further organizational changes, Stuart was appointed to the lateral position of Compliance and Business Integrity Officer (CBIO).  (*See id.* at ¶ 4.)  Pursuant to this position, Stuart reported directly to Piche.  (*See id.*)

Beginning around November 2006, problems started to arise between Stuart and Piche.[2]  According to Peake, Stuart submitted a CBI 2006 Annual Report that was incomplete and deficient.  (*See id.* at ¶¶ 8-9, 11-12.)  Piche subsequently met with Stuart several times to counsel him about the Report.  (*See id.*)  And on March 8, 2007, Piche issued a written admonishment to Stuart based on his alleged careless and negligent workmanship for failing to meet the substantive and timeliness requirements for the Report.  (*See id.* at ¶ 13.)  Stuart submitted a written

─────────────────────

[2]The court notes that in Peake's statement of material facts, defense counsel repeatedly refers to evidence in the record that does not support the facts being asserted. (*See, e.g.*, Def. SMF ¶¶ 5-15, 17-19, Dkt. No. 11:3.)  After giving a searching review of the record, and having been unable to find the evidentiary basis for these statements of fact, the court nonetheless concludes that a sufficient record exists from which to resolve the issues currently pending, particularly since all reasonable inferences will be drawn in favor of Stuart as the nonmoving party.

apology to Piche regarding his failures in drafting and executing the Annual Report.  (*See* Stuart Dep. at 22, Def. Ex. C, Dkt. No. 11:7.)  Consistent with the written admonishment, Piche noted in her October 30, 2007 Progress Review that Stuart, as CBIO, needed to "provide leadership to maintain recent improvements and advance the Program to a higher level of performance to result in a favorable review of the 2007 Annual Report." (*See* Def. SMF ¶ 15, Dkt. No. 11:3; *see also* Pl. Ex. 6, Dkt. No. 16:2.)  Still, in the same Progress Review, which covered the period between October 2006 and September 2007, Piche consistently rated Stuart's performance as "[f]ully [s]uccessful or better."  (*See* Pl. Ex. 6, Dkt. No. 16:2.)

On November 1, 2007, Piche and Stuart attended a video conference with Piche's supervisor, Network Director Steven Lemons, and several Network CBIO personnel including Laurence Kaminsky, Associate Chief of Staff of Research and Development, and Christine Wood, Administrative Officer for Research.  (*See id.* at ¶ 16.)  During this meeting, Piche was made aware that seven principal investigators working at the Stratton facility had not completed their required training even though Piche had certified one-hundred percent compliance with training requirements.  (*See* Stuart Dep. at 22, Def. Ex. C, Dkt. No. 11:7; *see also* Piche Dep. at 18-20,

25, Def. Ex. B, Dkt. No. 11:6.)  Accordingly, Lemons scolded Piche for this error, in response to which Piche muted her microphone, stated that that was "embarrassing," and shortly thereafter left the room.  (*See* Stuart Dep. at 22-23, Def. Ex. C, Dkt. No. 11:7; *see also* Piche Dep. at 22-24, Def. Ex. B, Dkt. No. 11:6.)

On November 8, 2007, one week after the video conference, Piche met with Stuart and asked him to agree to be reassigned to Administrative Officer of the Facilities Management Service.  (*See* Def. SMF ¶ 18, Dkt. No. 11:3.)  While Peake contends that this reassignment was based on Stuart's alleged repeated failings as CBIO, (*see id.* at ¶ 17), Stuart testified that Piche told him that she had "lost confidence in [his] ability to keep her out of embarrassing situations," (Stuart Dep. at 21, Def. Ex. C, Dkt. No. 11:7).  Despite Stuart's refusal to acquiesce to be reassigned for something he was not responsible for, Piche notified Stuart the following day that he was being reassigned.  (*See id.* at 24; *see also* Def. Ex. D, Dkt. No. 11:8.)  In this new position, although Stuart maintained the same salary and grade, his duties became clerical with minimal supervisory authority, and he was no longer reporting directly to Piche.  (*See* Stuart Dep. at 25-27, Def. Ex. C, Dkt. No. 11:7.)  His new office in the facility's basement

5

consisted of a folding table and chair with no computer.  (*See id.*)  The

position of CBIO was then filled by Mary Ann Witt, a Caucasian woman.

(*See* Piche Dep. at 14, Def. Ex. B, Dkt. No. 11:6.)

On November 28, 2007, Stuart filed an informal complaint of race

discrimination with the VA Equal Employment Opportunity (EEO) Office.

(*See* Stuart Dep. at 28, Def. Ex. C, Dkt. No. 11:7.)  One month later, on

December 28, Stuart filed a formal complaint with the VA EEO Office.  (*See*

Pl. Ex. 2, Dkt. No. 16:1.)

On January 18, 2008, Stuart was notified by Piche that he was being

suspended for three days.  (*See* Def. SMF ¶ 20, Dkt. No. 11:3 (citing Def.

Ex. D, Dkt. No. 11:8).)  According to Peake, this suspension was based on

Stuart's careless and negligent work on the 2007 Annual Report.  (*See id.*)

In contrast, Stuart contends that the negative critiques he received from

Piche occurred during the preliminary draft review period, which is

mandated under the VA's standard procedures and during which the

document is placed on a public drive for review and comment.  (*See* Pl.

SMF ¶ 31, Dkt. No. 15.)  Stuart further points to evidence in the record

suggesting that the VA facilities in the Albany region, including Stratton,

displayed a marked improvement on the 2007 Annual Reports.  (*See id.* at

¶¶ 32-33.)  However, Peake disputes whether Stuart was actually responsible for these improvements.  (*See* Def. Resp. SMF ¶¶ 31-33, Dkt. No. 19).  Still, Stuart alleges that after posting his draft report for review, he was removed from his position as CBIO and prevented from effectively completing the 2007 Annual Report.  (*See* Pl. SMF ¶ 31, Dkt. No. 15; *see also* Feb. 1, 2008 Stuart Mem. at 11, Def. Ex. D, Dkt. No. 11:8.)

On June 27, 2008, Stuart filed an amended complaint with the VA EEO Office to add a claim of retaliation.  (*See* Pl. Ex. 4, Dkt. No. 16:2.) Following a Final Agency Decision dated September 29, 2008, Stuart brought suit on December 18, 2008, against defendant Peake for race discrimination and retaliation.  (*See* Compl. ¶ 5, Dkt. No. 1.)  In asserting these claims, Stuart sought economic and non-economic compensatory damages, attorneys' fees and costs, and either restoration to his former position or front pay for diminished opportunity.  (*See id.* at 5.)  Following discovery, Peake moved for summary judgment.  (*See* Dkt. No. 11.)

### III.  Standard of Review

The standard for the grant of summary judgment is well established and will not be repeated here.  For a full discussion of the standard, the court refers the parties to its previous opinion in *Bain v. Town of Argyle*,

499 F. Supp. 2d 192, 194-95 (N.D.N.Y. 2007).  In the fact-intensive context of a discrimination action, "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions."  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001); *see also Gallo v. Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994) ("A trial court must be cautious about granting summary judgment to an employer when ... its intent is at issue.").

## IV.  Discussion

### A.    Race Discrimination

Under Title VII, it is "an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).

In analyzing claims of race discrimination, courts apply the burden-shifting rules first set forth in *McDonnell Douglas Corp. v. Green*, which place upon the plaintiff the initial burden of making out a prima facie case of discrimination.  411 U.S. 792 (1973).  A plaintiff must satisfy this burden

by showing: "(1) membership in a protected class; (2) satisfactory job performance; (3) termination from employment or other adverse employment action; and (4) the ultimate filling of the position with an individual who is not a member of the protected class." *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir. 2001). The fourth prong may also be satisfied by demonstrating that "the discharge or adverse employment action occurred under circumstances giving rise to an inference of discrimination" based on the plaintiff's membership in a protected class. *Id.* The Second Circuit characterizes the plaintiff's prima facie burden as "minimal." *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005) (citations omitted).

In establishing "satisfactory job performance," the plaintiff is only required to make a "minimal showing of qualification" by demonstrating that he "possesses the basic skills necessary for performance of the job." *Owens v. N.Y. City Hous. Auth.*, 934 F.2d 405, 409 (2d Cir. 1991) (internal quotation marks and citation omitted); *see also Thornley v. Penton Publ'g, Inc.*, 104 F.3d 26, 29-30 (2d Cir. 1997) (holding that job performance is analyzed under the employer's criteria for the specific position and not a hypothetical objective standard). Rather than showing "perfect

9

performance or even average performance," the plaintiff is only required to "show that his performance was of sufficient quality to merit continued employment." *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1155 (2d Cir. 1978) (internal quotation marks and citation omitted). And "[a]lthough misconduct indicates a high likelihood that an employee's performance is not satisfactory ... it is at least theoretically possible that an employee committed some misconduct and yet, in the aggregate, performed satisfactorily." *Thornley*, 104 F.3d at 29-30; *see also Ruiz v. County of Rockland*, --- F.3d ----, 2010 WL 2541179, at *4 (2d Cir. June 25, 2010).

"A plaintiff's establishment of a prima facie case gives rise to a presumption of unlawful discrimination that shifts the burden of production to the defendant, who must proffer a 'legitimate, nondiscriminatory reason' for the challenged employment action." *Woodman*, 411 F.3d at 76 (internal citations omitted). If the defendant proffers a legitimate, nondiscriminatory reason for the challenged employment action, the presumption of discrimination drops out of the analysis, and the defendant "will be entitled to summary judgment ... unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000).

Ultimately, once the burden shifts back to the plaintiff, the plaintiff must show, without the benefit of the presumption, "that the employer's determination was in fact the result of racial discrimination." *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008). The plaintiff must demonstrate by a preponderance of the evidence that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). This showing may be made "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.*; *see also Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1180-81 (2d Cir. 1992). Thus, to avoid summary judgment, "the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Holcomb*, 521 F.3d at 138 (internal quotation marks and citation omitted).

Here, the court is satisfied that Stuart has established a prima facie case of race discrimination. First, as an African American, Stuart is a

11

member of a protected class.  Second, despite the negative assessments

given and adverse actions taken by Piche against Stuart, there is ample

evidence that Stuart possessed the basic skills necessary to perform the

job of CBIO in accordance with the VA's criteria.  In particular, Stuart has

been employed by the VA for twenty-five years and, during the course of

this employment, has steadily advanced to the positions of Financial

Manager, Fiscal Officer, Business Office Manager—where he allegedly

performed the duties of Associate Director—and CBIO.  Additionally, in the

October 30, 2007 Progress Review, Piche appraised Stuart's performance

as "[f]ully [s]uccessful or better."  (Pl. Ex. 6, Dkt. No. 16:2.)  Thus, while

Piche's later critiques may have had merit, the record in the aggregate

indicates that Stuart performed his job satisfactorily.

    Third, contrary to Peake's contentions, Stuart's reassignment was an

adverse employment action.  Aside from the fact that Stuart did not suffer a

decrease in pay, it seems clear that the reassignment from CBIO to

Administrative Officer was adverse.  As Stuart puts it, "[h]e was moved

from a front office position with high level responsibility and reporting

directly to the facility's Director to a [clerical] position ... three steps

removed from the Director ... with a basement location."  (Pl. Resp. Mem.

of Law at 7-8, Dkt. No. 14.)  Even Piche testified that Stuart had less responsibility as an Administrative Officer than as the CBIO.  (*See* Piche Dep. at 38, Def. Ex. B, Dkt. No. 11:6.)  And equally important, Stuart testified that his reassignment and suspension has "severely damaged" his career and promotability.  (Stuart Dep. at 56, Def. Ex. C, Dkt. No. 11:7.) Thus, Stuart experienced an adverse employment action.

Lastly, as to the fourth prong, there is evidence demonstrating that the CBIO position was subsequently filled by a Caucasian person. Moreover, one could reasonably infer from the circumstances surrounding the November 1, 2007 video conference that Piche treated other similarly-situated white employees differently than Stuart.  Specifically, Stuart and Piche both testified that it was actually Laurence Kaminsky and Christine Wood —both of whom are Caucasian—who were responsible for embarrassing Piche by submitting inaccurate training compliance records and that no action was taken with respect to either of them.  (*See id.* at 23-24, 31-33; Piche Dep. at 19-22, Def. Ex. B, Dkt. No. 11:6.)

Accordingly, because Stuart has established a prima facie case of race discrimination, Peake must proffer a "legitimate, nondiscriminatory reason" for the adverse action.  While Peake devotes his entire argument

13

to the prima facie case, the court is nonetheless certain, and Stuart concedes, that the reasons given for his reassignment and suspension were, on their face, legitimate and nondiscriminatory.

However, the court is also certain that for purposes of summary judgment Stuart has adequately demonstrated that the reasons offered by Peake were pretextual and not worthy of credence.  As already discussed, Stuart has shown that he was repeatedly treated differently than other similarly-situated Caucasian employees.  Moreover, discriminatory animus could be inferred from the stern nature of the disciplinary measures in combination with Stuart's allegations that he complied with standard protocol and was obstructed from revising or amending his draft report.

Therefore, in light of the above analysis, the court denies Peake's motion for summary judgment on Stuart's race discrimination claim.

**B.   Retaliation**

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing."  42 U.S.C. § 2000e-3(a).

To establish a prima facie case of retaliation under Title VII, a plaintiff

must show that "(1) he participated in a protected activity, (2) the defendant knew of the protected activity; (3) he experienced an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action."  *Jackson v. N.Y. City Transit*, No. 08-2021-cv, 2009 WL 3287558, at *2 (2d Cir. Oct. 14, 2009) (citation omitted). A plaintiff can demonstrate an adverse employment action by showing "'that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 207 (2d Cir. 2006) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).  "Proof of causal connection can be established *indirectly* by showing that the protected activity was followed closely by discriminatory treatment or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or *directly* through evidence of retaliatory animus directed against a plaintiff by the defendant."  *See DeCintio v. Westchester County Med. Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987) (internal citations omitted); *see also Gorman-Bakos v. Cornell Co-op*, 252 F.3d 545, 554-55 (2d Cir. 2001).

15

Once a prima facie case of retaliation is established, the *McDonnell Douglas* burden shifting analysis applies.  *See Jackson*, 2009 WL 3287558, at *2.  It first requires the employer to "proffer[] a legitimate, non-retaliatory reason for the challenged employment decision ...."  *Id.*  If that showing is made, the plaintiff is then required to present "evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001).

Stuart has established a prima facie case of retaliation.  First, in filing an informal and formal complaint with the VA EEO Office, Stuart participated in a protected activity.  Second, the parties do not dispute that Piche knew about Stuart's complaints shortly after they were filed.  (*See* Def. SMF ¶ 18, Dkt. No. 11:3.)  Third, within one month of filing a formal complaint, Stuart was suspended.  And fourth, Stuart can establish causal connection indirectly based on the temporal proximity between the filing of the complaints and the suspension.  It is also possible that retaliatory animus is evidenced by Stuart's refusal to accept the blame for the November 1, 2007 video conference or to accede to Piche's reassignment request and the consequent actions taken by Piche against him.

16

As to the questions of whether Peake has proffered a legitimate, nondiscriminatory reason and whether that reason is pretextual, both Peake and Stuart can meet their sequential burdens on grounds similar to those outlined in the discrimination context.  Thus, the court denies Peake's motion for summary judgment on Stuart's claim of retaliation.

## V.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Peake's motion for summary judgment (Dkt. No. 11) is **DENIED**; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

August 23, 2010
Albany, New York

United States District Court Judge

17